[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 357 
This is an adoption case. The divorced natural mother, Brenda Turner Davis, a minor, appeals from a final decree of adoption entered by the Probate Court of Washington County on December 4, 1975. The decree established the divorced father's parents, appellees here, as the child's adoptive parents.
This case has previously been before the Court of Civil Appeals sub nom. Davis v. Turner, 55 Ala. App. 366,315 So.2d 602. At that time we dismissed the natural mother's appeal from an earlier order of the same probate court decreeing adoption by the same adoptive parents. Our ground for dismissal was that the earlier order was interlocutory and would therefore not support appeal. Since that dismissal, the probate *Page 358 
court conducted a further hearing on December 4, 1975. At that hearing the special probate judge heard testimony ore tenus. The decree issued after the hearing is final under Title 27, Code of Alabama 1940, as Recompiled 1958, and will support the present appeal.
There are three separate proceedings which will be referred to in this opinion. The first, not currently on appeal but of factual significance, was the divorce proceeding before the circuit court. The second, held in probate court, was the original hearing on the adoption which led to the interlocutory decree of December 11, 1974. This second hearing elicited most of the evidence relevant to the findings now on appeal. The third hearing, also conducted by the probate court, was the hearing of December 4, 1975 held after our dismissal of the earlier appeal. The third hearing produced little evidence of concern to us at this time. A special probate judge was required to conduct the second and third hearings because the regular probate judge, Tom W. Turner, is a party in this case. Judge Turner is the child's paternal grandfather, one of the appellees here.
The basic facts of the case are these:
Brenda married David Turner, the child's natural father, when she was fifteen and he seventeen years of age. Brenda was pregnant with the child in question at that time. The husband filed his complaint for divorce in the circuit court on July 16, 1974. Hearing was set for July 24, 1974, on the complainant's prayer for temporary award of custody of the child.
On July 23, 1974 Brenda filed her answer and waiver. That same day, she executed an instrument nominating her attorney, Gaines McCorquodale, to be her guardian ad litem and in connection with the divorce.
The parties stipulated in open court that Brenda would consent to the adoption of her child by the paternal grandparents, Tom W. Turner and Hattie P. Turner.
On August 3, 1974 Brenda's husband appeared before the clerk and gave a deposition stating facts in support of the divorce and child custody awards.
The divorce decree, issuing September 3, 1974, awarded custody of the child to appellees; no visitation privileges were reserved to Brenda.
On October 18, 1974 appellees filed a petition to adopt the child, attaching to the petition a written instrument dated July 25, 1974, signed by Brenda consenting to the child's adoption.
On October 31, 1974 Brenda, through her next friend, filed an answer to the petition. The answer denied that she had given her consent; stated that the consent was obtained through fraud, coercion and misrepresentation, and that at the time of signing she did not know what she was signing or the consequences of the same; and further that she is a minor and revokes and rescinds any consent allegedly given.
On November 16, 1974 Brenda amended her answer, adding counts alleging that Brenda was advised that the consent form pertained only to custody and not to adoption, that if she signed she would be granted extensive visitation rights, and that Brenda relied on this advice in signing the form; that no guardian-ad-litem was appointed by the court to represent her at the signing, and it was not signed under supervision of the court; and that appellee Tom W. Turner exercised undue influence as probate judge.
November 18, 1974: Brenda filed a motion to set aside the judgment of divorce and child custody. The grounds for the motion were that Brenda did not learn of the divorce decree until October 28, no copy having been served on her; that prior to learning of the decree she had informed her attorney that she did not consent for appellees to have custody of the child, and was advised that no judgment would issue and the cause would be set for trial; that the decree of September 3 was obtained through mistake, inadvertence, and surprise on Brenda's part, and was due to her tender years and Judge Turner's influence; and, in addition, the motion went on to reiterate grounds already set forth above. *Page 359 
The hearing on the interlocutory decree was held November 26, 1974. At that hearing the following pertinent testimony was elicited:
Gaines McCorquodale testified that prior to the custody hearing he had negotiated with the Turners' lawyer about the divorce and custody of the child. The question of adoption was discussed between the lawyers. The Turners did not discuss directly with Brenda or her father the question of adoption. McCorquodale said he had authority from Brenda and her father to negotiate a settlement that day. A settlement was in fact reached, and a discussion was had with Brenda and her father prior to executing it. After orally agreeing, the parties appeared in open court and stipulated the agreement into the record. Judge Lindsey was on the bench.
McCorquodale further testified that he and Brenda and her father discussed the adoption of the child several times during the negotiations prior to the making of the written stipulation. They agreed that the formal consent would be handled later in his office. According to McCorquodale, Brenda's father was present when she signed the consent for adoption, and the consequences of the consent were fully explained to her at that time. Prior to reaching the agreement, the lawyer advised Brenda that she had no chance to receive custody of the child due to damaging facts in the case. Four thousand dollars was to be paid by the Turners in consideration of the consent to adoption and the waiver and answer filed in the divorce action. McCorquodale said he held the waiver and answer and the consent form in his office until the $4,000 check was delivered to him, pursuant to an agreement with his client. Several weeks after receiving the check, Brenda went back to her lawyer's office and said she wanted to stop the adoption and divorce, because she had changed her mind. McCorquodale said he had not received a divorce decree at this time.
Brenda's father testified that McCorquodale told them that the Turners had offered to settle. Under the terms of the agreement, the Turners would have permanent custody, and would be allowed to adopt the child. Brenda would be given reasonable visitation rights and would be paid a sum of money. Brenda's father said he and Brenda agreed to the settlement because they did not think they had any other alternative. He also testified that McCorquodale did not explain anything about the consent when she signed it, but just told her to sign it and he would hold it until he received the money. Brenda's father further testified that he thought that his daughter was consenting to custody of the child and was to have visitation. He said they did not discuss adoption. He said he heard the stipulation read in open court but that he did not understand what it meant.
Brenda testified the agreement was intended to provide only for custody of the child, and there was no discussion of adoption prior to her giving written consent. She testified that she did not know, when she signed the consent form, that she was consenting to the adoption of her child, but she thought she was consenting to custody only. She stated that the petition for adoption was first served on her after she told Gaines McCorquodale to stop all proceedings including adoption; that she just learned of the decree granting custody to the Turners and denying her visitation rights on the day the petition for adoption was set for hearing. She further testified that she wished to withdraw her consent to the adoption, if it was found that she had in fact given her consent, and that the $4,000 was paid for custody of the child plus her education and bills. She spent all of the money in two months.
Subsequent to this hearing the special probate judge found the issues in favor of appellees and decreed adoption of the child in favor of the Turners. The previous appeal to this court followed, after which the third hearing in this case was conducted. Evidence at that hearing reestablished the above facts, and added additional testimony tending to show both Brenda's and appellees' fitness for custody of the child, and that the child had grown accustomed to *Page 360 
living with the Turners. During this entire time the child has remained with appellees under provisions of the circuit court's divorce decree.
On December 4, 1975 the probate court entered the order appealed from. This order finalized adoption by the grandparents.
The first argument raised on appeal is that the record conclusively shows that Brenda's consent was obtained through mistake, coercion, fraud, or undue influence. Under Williams v.Pope, 281 Ala. 416, 203 So.2d 271, appeal after remand,284 Ala. 456, 225 So.2d 861, revocation of the natural mother's consent can be effectively predicated on the presence of those factors at the time consent was rendered. However, as the above summary of the record in this case shows, it is far from clear that any untoward circumstances accompanied the rendition of consent.
Brenda's allegations are supported by her testimony and, to a lesser degree, by that of her father. The allegations are flatly contradicted by McCorquodale's testimony and by the stipulation made in open court on July 23, 1974. It is the opinion of this court that the July 23 stipulation constitutes Brenda's consent to the adoption of her child: the later consent form is merely a memorandum preserving that consent for later uses. The stipulation was given in open court in the presence of Brenda, her father, and her attorney who was also her guardian ad litem for all matters involved in the divorce proceedings. With the procedural safeguards attendant upon the entry of this stipulation, it cannot be gainsaid that the trial court below had sufficient evidence to find that consent was freely and knowingly given in a noncoercive atmosphere. The evidence being legally sufficient, we will not reverse on this ground, Lankford v. Hollingsworth, 283 Ala. 559, 219 So.2d 387.
Brenda's second argument is that under Graves v. Graves,51 Ala. App. 601, 288 So.2d 142, the consent of a natural parent may be revoked for legal cause prior to the entry of a final decree. It is Brenda's contention that her status as a minor is legal cause for revocation. The effect of a natural parent's nonage on consent to adoption is a novel question in Alabama.
It is clear that Brenda's consent was required at some point in the adoption process. The Alabama adoption statute, Title 27, Section 3, Code of Alabama 1940, states in pertinent part:
 "No adoption of a minor child shall be permitted without the consent of his parents, but the consent of a parent who has abandoned the child, or who cannot be found, or who is insane or otherwise incapacitated from giving such consent, or who has lost guardianship of the child, through divorce proceedings, or by the order of a juvenile court or court of like jurisdiction, may be dispensed with, and consent may be given by the guardian if there be one, or if there be no guardian by the state department of public welfare. . . ."
It is expressly provided in the quoted passage that the natural mother's consent is mandatory before an adoption can come about, unless one of the enumerated occurrences has relieved her of the power to grant or withhold consent. None of these occurrences took place in the present case.
The nearest analogy in the instant facts to one of the enumerated occurrences is the circuit court's grant of custody to the appellees as part of the divorce proceedings. Such grant of custody is not, however, for purposes of the adoption statute, equivalent to the appointment of a guardian, McGowenv. Smith, 264 Ala. 303, 87 So.2d 429.
Adoption is strictly statutory, Hanks v. Hanks, 281 Ala. 92,199 So.2d 169. Being unknown at common law, it cannot be achieved by contract, Prince v. Prince, 194 Ala. 455,69 So. 906. Adoption is not merely an arrangement between the natural and adoptive parents, but is a status created by the state acting as parens patriae, the sovereign parent. Because the exercise of sovereign power involved in adoption curtails the fundamental parental rights of the natural parent, the adoption statutes *Page 361 
must be closely adhered to. In a minority of jurisdictions, Alabama not among them, a contract alone will give rise to a limited number of enforceable obligations incident to legal adoption. Even in those jurisdictions, however, such "equitable adoption" is held to be distinct from true legal adoption which is statutory, not contractual, St. Vincent's Infant Asylum v.Central Wisconsin Trust Co., 189 Wis. 483, 206 N.W. 921; Barneyv. Hutchinson, 25 N.M. 82, 177 P. 890. In the present case we are not dealing with an alleged equitable adoption, but are presented with the issue of consent in its purely statutory context.
Under the Alabama statute it is the state's sovereign power, manifested by court decree, which brings the adoption to pass. The consent of the natural parent is not the instrument of adoption: rather, the giving of consent at some point is one of the prerequisites to the probate court's consideration of the subject matter.
Where this jurisdictional prerequisite has been satisfied at the time of the decree, the decree consummates the adoption and a later withdrawal of consent has no effect. Where a required consent has never been given, the trial court never obtains jurisdiction to proceed to the paramount question of the child's welfare. In the case before us now, the natural mother gave consent at one point in time but attempted to repudiate this consent, relying on the disability of nonage, prior to the rendition of the final decree.
There is a split of authority among those states which have dealt with this problem. One line of cases holds that consent must continue up until the rendition of the decree or the trial court loses jurisdiction, In re Adoption of Schult,14 N.J. Super. 587, 82 A.2d 491; In re Adoption of Susko, 363 Pa. 78, 69 A.2d 132; In re Adoption of McKinzie, 275 S.W.2d 365, Mo.App. The other line of decisions holds that jurisdiction attaches with the initial manifestation of consent and remains in spite of attempted repudiation of consent, Walter v. August,186 Cal.App.2d 395, 8 Cal.Rptr. 778 (1960). This latter line of cases likens adoption to an in rem proceeding, analogous to divorce. The natural parent's initial consent followed by placement of the child with the adoptive parents creates a res, a preadoptive relationship, over which the trial court maintains jurisdiction until adoption is finally decreed or denied. Since it is this res, not the consent agreement per se, which furnishes jurisdiction, repudiation of consent does not withdraw jurisdiction. By keeping jurisdiction, the trial court is fully able to inquire into the best interests of the child.
In light of the unique features of Alabama's adoption statute, the in rem approach to jurisdiction is more appropriate. Jurisdiction attaches with the initial acknowledgement of consent by the natural parent, and, once the child is placed, remains despite attempts at revocation, so long as the child's welfare is thereby furthered.
This is consistent with Graves, supra, and with Williams v.Pope, supra, wherein it was held that revocation of consent to adoption once the child has been placed is ineffective absent legal cause. The term "legal cause" mentioned in Williams v.Pope referred to prior or contemporaneous misconduct in the procurement of the consent, such that the consent could be considered void ab initio and to facts proving that revocation would be in the child's best interest. There is no room for the suggestion that subsequent unilateral change of mind by the natural parent could amount to such legal cause.
With this context for consent, it is clear that the disabilities of nonage do not amount to such a legal cause as will support a finding that the consent was void at the outset. Minors' obligations are not void, but voidable only, Sims v.Gunter, 201 Ala. 286, 78 So. 62. The undertaking of a minor is not totally ineffectual, it is merely unenforceable if later repudiated, Keller v. Ray Motor Co., 22 Ala. App. 252,114 So. 422. The minor can elect to keep his agreement in force, but is not legally required to do so, Smoot v. Ryan, 187 Ala. 396,65 So. 828. *Page 362 
The consent here was thus valid at the time it was given and remained so at the time the Turners took custody of the child. The subsequent attempt at repudiation, whatever its other possible effects, therefore does not withdraw the adoptive res
from the trial court's jurisdiction. The court had the jurisdiction to proceed to its final decree.
Finally, there is sufficient evidence for the trial court to find, as it did, that the child's best interest lies with the Turners. There is no need to detail the evidence elicited at the various hearings reflecting negatively on Brenda's marital conduct and immature attitude toward her responsibilities. Suffice it to say that, even crediting that testimony showing some recent improvement on her part, the evidence clearly tended to show the Turners to be better suited to parenthood than Brenda.
There being no reversible error in the record, the decree of the special probate judge is affirmed.
AFFIRMED.
WRIGHT, P.J., and HOLMES, J., concur.